UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

AT&T CORPORATION,

                                       Plaintiff,

                    -against-

VOICE STREAM NETWORK, INC.,

                                       Defendant.

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 2/2/2017

15-CV-8155 (LLS)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LOUIS L. STANTON:**

On July 6, 2016, the Honorable Louis L. Stanton referred this matter to my docket for an inquest on damages and to report and recommend on the motion for default judgment filed by Plaintiff AT&T Corporation ("AT&T"). Judge Stanton entered a default against Defendant Voice Stream Network, Inc. ("Voice Stream") on December 2, 2015. Because AT&T has provided the Court with a sufficient basis on which to award damages and Voice Stream failed to appear in the action or present an opposition to the motion for default judgment, the Court recommends an award of $11,915,865.40 plus prejudgment interest. The Court, recommends, however, that AT&T's request for permanent injunctive relief be denied.

## PROCEDURAL BACKGROUND

On October 16, 2015, AT&T brought this action against Voice Stream, alleging violations of the Communications Act of 1934, 47 U.S.C. § 151 *et seq*., and regulations promulgated under its authority, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, federal tariff law under 47 U.S.C. § 203, and Florida and New York consumer protection statutes, Fla.

Stat. § 501.201 *et seq.*, and New York Gen. Bus. Law § 349, as well as state law fraud claims

under Iowa, Florida, and New York law. ECF No. 1, Compl. ¶¶ 67–152. AT&T alleged that

Voice Stream, a least cost router, engaged in two separate courses of fraudulent conduct

involving the unlawful alteration of electronic call data, first to rural destinations between

December 2014 and January 2015, and then to international mobile destinations between May

and June 2015. AT&T alleges it has incurred $11,915,865.40 in damages as a result of this

conduct.

On November 10, 2015, AT&T filed an Affidavit of Service stating that on October 30,

2015, it had served the summons and complaint upon the New York State Department of State,

which was acting as Voice Stream's registered agent. ECF No. 9. After no answer was timely

filed, AT&T requested on December 2, 2015, that a default be entered against Voice Stream

pursuant to Federal Rule of Civil Procedure 55(a). ECF No. 14. The Clerk of Court entered a

default on the same day. ECF No. 17.

Following a pre-motion conference, AT&T moved for default judgment against Voice

Stream on June 30, 2016. ECF No. 24. On June 6, 2016, this motion was referred to my docket

for a report and recommendation. ECF No. 32.

## FACTUAL BACKGROUND

**I.      Background on Telecommunications Services**

In order to gauge the legal sufficiency of the factual allegations in this matter, some

background on the structure of the telecommunications industry is needed. AT&T is a provider

of long-distance wireline telecommunications services, also known as an "interchange carrier" or

"IXC." Compl. ¶ 2. Interchange carriers like AT&T do not have a universal network that

connects every landline and wireless phone in the country; instead, they rely on "local exchange

carriers" ("LECs") to transport long-distance calls within the LEC's local calling area. Panagia Decl. ¶ 5. Under this arrangement, local exchange carriers bill the national interchange carriers for access to their network, while the IXCs bill the customer who made the call. Id. ¶ 8. Payments from IXCs to LECs for call origination and termination services are called "switched access charges." Id. ¶ 8. Sometimes, especially in rural areas, an IXC must pass calls through several intermediate carriers to connect to the LEC at the call's final destination. Id. ¶ 10. In general, the IXC pays fees to all of the LECs that helped transport the call.

"Least cost routers," or "LCRs," are another type of carrier that helps IXCs transport long-distance telephone calls. LCRs specialize in automatically finding and choosing the least expensive way to carry a given long-distance call between LECs and IXCs using industry routing tables and software algorithms. Id. ¶ 12. When a call is transmitted through an LCR, the IXC pays only the intermediate carrier with which it has a connection. The "upstream" intermediate carrier then passes the call to the LCR and pays it a fee that covers all of the charges that the LCR will pay to carriers "downstream" until the call reaches its destination (plus a small profit margin). Id. Voice Stream is, or at least purported to be, an LCR. Id. ¶¶ 18–19.

Each call made on the long-distance network has associated data that accompanies it for recordkeeping and billing purposes, including the number dialed, the time and duration of the call, and a Carrier Identification Code or "CIC" pertaining to the IXC that is handling the call. Id. ¶¶ 14–15. The CIC is important for both routing and billing, as it informs intermediate carriers and LECs which IXC they should bill their switched access charges to. Id. ¶ 15.

## II.    Voice Stream's First Alleged Fraudulent Alteration of Call Data

In December 2014 and January 2015, Voice Stream, in the course of its operations as an LCR, received a number of domestic long-distance calls originating with non-AT&T customers,

and was paid the fees necessary to terminate the calls. Id. ¶ 19. Instead of properly doing the job

of an LCR, however, Voice Stream altered the data records by inserting AT&T's CIC (0288)

into the data stream, before turning the calls over to Inteliquent, an intermediate carrier. Id. ¶ 20.

Voice Stream did not pay any fees to Inteliquent or any other downstream carrier. Id. ¶ 21. This

alteration made downstream carriers, including the terminating LEC, believe that the calls came

from AT&T customers, when in reality they came from customers of other IXCs. Id. ¶ 22. This

caused Inteliquent to deliver the affected calls to AT&T Corp., who then transferred the calls to

terminating LECs and paid the corresponding switched access charges to carriers downstream.

Id. ¶ 22. Notably, the calls altered by Voice Stream were largely destined for rural areas with

high switching rates, such as rural Iowa. Id. ¶ 24.

Because the phone calls had CICs indicating that they originated with AT&T customers,

AT&T proceeded to attempt to bill such customers, even though they were in reality customers

of different IXCs. A consortium of rural LECs reported to AT&T that customers were

complaining of double-billing by AT&T and their subscribed long-distance provider. Id. ¶ 28.

Similar reports came from the Federal Communications Commission and public authorities in

Minnesota, Iowa, and South Dakota. Id. ¶ 29. AT&T investigated the suspicious calls with the

aid of Inteliquent and discovered that Voice Stream transmitted the traffic where AT&T's 0288

CICs had been inserted. Id. ¶ 34. On January 29, 2015, Inteliquent blocked all traffic from Voice

Stream and the issue was resolved. Id. ¶ 36. AT&T's customer service team worked to identify

and cancel bills to double-billed customers. Id. In total, AT&T identified 480,928 calls for

722,998 minutes originating from 176,158 telephone numbers that were affected by Voice

Stream's activity, between December 3, 2014, and January 29, 2015. Id. ¶ 37.

### III.  Voice Stream's Second Alleged Fraudulent Alteration of Call Data

After the interruption of Voice Stream's activities with Inteliquent, Voice Stream resumed altering data on May 26, 2015, now targeting international long-distance calls destined for mobile numbers in high-cost countries such as Haiti, Honduras, Guatemala, and Jamaica. Id. ¶¶ 38–39. In addition to inserting AT&T's CIC into the data streams of the calls that it was receiving for termination, Voice Stream also removed the call data that identified the end user who made the call, including their telephone number. Id. ¶ 41. Voice Stream then inserted a new telephone number, either a falsified number or a number assigned to Voice Stream in Florida, Iowa, or New York, in order to avoid the double billing that had previously alerted AT&T to the modification of CIC data. Id. Voice Stream then delivered the calls to an intermediate carrier, Onvoy Voice Services, who routed the calls to AT&T. Id. ¶ 42. AT&T then routed the calls to other carriers for termination and paid international terminating charges to downstream carriers. Id. at ¶ 43. Because the original numbers on many of the calls had been modified, AT&T was also prevented from recovering its charges from the original calling parties. Id.

On May 28, 2015, AT&T employee Rodney Wyman detected a significant increase in "billing name and address requests," which are generated when AT&T provides services and cannot identify who to bill for them because the calling party is not a presubscribed customer. Wyman Decl. ¶ 11. An investigation discovered that all of these requests did not appear to come from actual AT&T customers, and were all being received from Onvoy Voice Services. Panagia Decl. ¶ 50. Once Onvoy was informed of these irregularities, it shut down its connections with Voice Stream on June 12, 2015. Id. ¶ 53. The fraudulent traffic stopped immediately after Onvoy took this step. Id.

Based on data provided by Onvoy, AT&T fond that it had carried 800,966 minutes of altered calls. Id. ¶ 54. 328,844 of these minutes were originated from 19,500 unique Voice Stream-assigned phone numbers in Iowa, Florida, and New York, while the remaining 472,122 minutes originated from either real customer telephone numbers or falsified phone numbers. Id.

AT&T proceeded to send Voice Stream bills for $6,038,857.17 and $5,861,859.45 on July 2 and July 15, 2015, respectively. Id. ¶¶ 58-59; Wyman Decl., Ex. C; Wyman Decl., Ex. D. The first invoice pertained to the calls associated with Voice Stream numbers based in Iowa, Florida, and New York, which were added to AT&T's standard automated billing system "Thrifty." Wyman Decl. ¶¶ 17–18. The second invoice pertained to the calls for which the telephone number was not replaced, or where Voice Stream inserted random "spoofed" telephone numbers. Id. ¶ 19. Here, individual invoices were not provided; rather a manual billing summary was created. Id. Ex. D. In generating these billing estimates, AT&T billed Voice Stream as if it were a standard retail customer, because it had not negotiated wholesale prices with AT&T in advance. Id. ¶ 20. The rates utilized were from AT&T Tariff FCC No. 4. Id. ¶ 21; Ex. B. No payment was received from Voice Stream on either of the invoices. Id. ¶¶ 60–62.

## DISCUSSION

### I.    Legal Standard

The Court of Appeals for the Second Circuit set forth the procedural rules applicable to the entry of a default judgment in City of New York v. Mickalis Pawn Shop, LLC:

> "Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004). Rule 55 provides a "two-step process" for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment. New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005). The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff. . . . The second step, entry of a default judgment, converts the

> defendant's admission of liability into a final judgment that terminates the litigation
> and awards the plaintiff any relief to which the court decides it is entitled, to the
> extent permitted by Rule 54(c).

645 F.3d 114, 128 (2d Cir. 2011).

Where default has been entered against the defendant, courts are to accept as true all of the well-pleaded facts alleged in the complaint, except those concerning the amount of damages. See Au Bon Pain Corp. v. Artect Inc., 653 F.2d 61, 65 (2d Cir. 1981); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997) (citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)); All-Star Mktg. Grp., LLC v. Media Brands Co., Ltd., 775 F. Supp. 2d 613, 618 (S.D.N.Y. 2011). Thus, the only issue on liability before the Court is whether the plaintiff has provided adequate support for its requested relief. See Gucci Am., Inc. v. Tyrrell-Miller, 678 F. Supp. 2d 117, 119 (S.D.N.Y. 2008) (citing Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)).

"[A] plaintiff seeking to recover damages against a defaulting defendant must prove its claim though the submission of evidence. . . ." Malletier v. Carducci Leather Fashions, Inc., 648 F. Supp. 2d. 501, 503 (S.D.N.Y. 2009). A court may determine the amount, if any, a plaintiff is entitled to recover without holding a hearing as long as (1) the court determines the proper rule for calculating damages, and (2) the evidence submitted by the plaintiff establishes "with reasonable certainty" the basis for the damages. Id. (citing Credit Lyonnais Sec. (USA), Inc., 183 F.3d at 155, and Transatlantic Marine Claims Agency Inc., 109 F.3d at 111); Tyrrell-Miller, 678 F. Supp. 2d at 121 (citing Langenberg v. Sofair, 03 Civ. 8339 (KMK)(FM), 2006 WL 3518197, at *1 (S.D.N.Y. Dec. 7, 2006)).

## II.   Liability

Courts evaluating damages first look to the complaint to determine whether the plaintiff has established a *prima facie* case for recovery. See Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012) (court must first determine whether the allegations in the complaint were sufficiently pled to establish liability); Eurosteel Corp. v. M/V Koggegracht, 01-CV-7731 (DLC), 2003 WL 1872652, at *1 (S.D.N.Y Apr. 11, 2003) (adopting report and recommendation that concluded that plaintiff had established a *prima facie* case for recovery). In this case, AT&T alleges that Voice Stream is liable to it under the Communications Act, Computer Fraud and Abuse Act, the Iowa, New York, and Florida common laws of fraud, and New York and Florida statutes barring deceptive trade practices. Compl. ¶¶ 67–152.

### A.   Communications Act § 201 Claim

Section 201(b) of the Communications Act states that "all charges, practices, classifications, and regulations for and in connection with [interstate] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Common carriers are liable to "the person or persons injured . . . for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter." 47 U.S.C. § 206. The Communications Act provides aggrieved parties a private federal right of action for the recovery of damages. 47 U.S.C. § 207.

"Insofar as the statute's language is concerned, to violate a regulation that lawfully implements § 201(b)'s requirements *is* to violate the statute." Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 54 (2007). Here, AT&T alleges that Voice Stream violated a regulation interpreting § 201(b) that requires that:

[i]ntermediate providers within an interstate or intrastate call path that originates and/or terminates on the [public switched telephone network] must pass unaltered to subsequent providers in the call path signaling information identifying the telephone number, or billing number, if different, of the calling party that is received with a call. This requirement applies to SS7 information including but not limited to [calling party number] and [calling party's charge number], and also applies to [multi-frequency] signaling information or other signaling information intermediate providers receive with a call.

47 C.F.R. § 64.1601.

Accepting the well-plead factual allegations in the Complaint as true, AT&T has adequately demonstrated that Voice Stream violated the Communications Act when it altered signaling information and calling party numbers between December 2014 and January 2015 and again between May 2015 and June 2015. As such, I recommend that the Court find that Voice Stream violated 47 C.F.R. § 64.1601 and therefore 47 U.S.C. § 201(b) and is liable to AT&T for any damages stemming from these violations. 47 U.S.C. § 206.

**B.      Tariff Collection Claim**

A complaint to collect on unpaid charges pursuant to a properly filed tariff arises under federal law. "The obligation of a user of interstate telephone service to pay for it at the rate fixed by tariff 'grow(s) out of and depend(s) upon' the Communications Act . . . . A complaint seeking to enforce that obligation therefore arises under the Communications Act." Ivy Broad. Co. v. Am. Tel. & Tel. Co., 391 F.2d 486, 494 (2d Cir. 1968); see also MCI Telecomms. Corp. v. Graham, 7 F.3d 477, 479 (6th Cir. 1993) ("The duty to pay a certain price for phone service is a federal obligation."). "An action such as this one, brought by a telecommunications carrier for the recovery of charges due under a tariff filed with the Federal Communications Commission, is considered an action under federal law . . . ." Worldcom Techs., Inc. v. ICC Inteleca Commc'ns, Inc., 37 F. Supp. 2d 633, 636 (S.D.N.Y. 1999) (citing Am. Tel. & Tel. Co. v. City of N.Y., 83 F.3d 549, 552 (2d Cir. 1996)).

To state a cause of action for collection of charges pursuant to a tariff governed by the Communications Act, a plaintiff must plead that (1) it operated under a federally filed tariff; and (2) it provided services to the customer pursuant to that tariff. Advamtel, LLC v. AT&T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000). In this case, the Complaint alleges that AT&T operated under a federally filed tariff. AT&T Corp. Tariff No. 4, Business Telecommunications Services; Wyman Decl., Ex. B. The Complaint also demonstrates that AT&T provided services to numbers identified with Voice Stream during the second data-altering episode. Compl. ¶¶ 93–95. While these services were ultimately provided to other users, Voice Stream's alteration of the calling phone numbers meant that there was no entity that AT&T could bill except Voice Stream.

The question, then, is whether, by altering the call data, Voice Stream can properly be characterized as a "customer" of AT&T, even though the services that AT&T performed were actually ordered and provided by unknown third parties. In general, one becomes a customer of a certain carrier "in one of two ways: (1) by 'affirmatively' ordering the service by presubscribing . . . [or] (2) by constructively ordering [the services] and creating an 'inadvertent carrier-customer relationship' by failing to take 'reasonable steps' to control unauthorized charging of [the carrier's] long-distance calls to the party's telephone number." Am. Tel. & Tel. Co. v. City of N.Y., 83 F.3d 549, 553 (2d Cir. 1996) (citing United Artists Payphone Corp. v. New York Tel. Co., 8 F.C.C.R. 5563, at ¶ 13 (1993)). Under the constructive ordering doctrine, a party is liable when it (1) was interconnected in such a manner that it could expect to receive access services, (2) failed to take reasonable steps to prevent the receipt of services, and (3) did in fact receive such services. See Advamtel, 118 F. Supp. 2d at 685.

I recommend that the Court decline to reach the question of whether a tariff collection claim is proper because AT&T has not adequately briefed the issue of whether Voice Stream was

its "customer" either affirmatively or under the "constructive ordering" doctrine. Because I recommend that the full damages sought by AT&T be granted upon other theories it propounds, it is unnecessary for the Court to wade into this complicated issue without the benefit of full briefing.[1]

### C.     Computer Fraud and Abuse Act

Section 1030(a)(4) of the Computer Fraud and Abuse Act (CFAA) punishes those who (1) knowingly and with intent to defraud (2) access a protected computer (3) without authorization or exceed authorized access and (4) obtain something of value over $5,000. 18 U.S.C. § 1030(a)(4). AT&T alleges that it has adequately pled a violation of this section because (1) Voice Stream accessed embedded call data on switches and/or network computers used in the routing of calls in excess of its authorization; (2) Voice Stream knowingly altered the call data contained therein to defraud AT&T Corp.; (3) Voice Stream's access furthered its fraud; and (4) Voice Stream's conduct caused AT&T Corp. to lose more than $5,000. Compl. ¶¶ 82–90. The statute provides a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g).

Accepting AT&T's well-pled allegations as true, AT&T has proven that Voice Stream acted knowingly and with intent to defraud. The pattern of conduct described in the complaint reflects deliberate alteration of calling phone numbers and Carrier Identification Codes on a

---

[1] On the one hand, it could be argued that Voice Stream is not a customer because its deceptive activities consisted solely of duping AT&T into paying termination fees that should have been Voice Stream's responsibility. As such, AT&T ended up providing services to largely unknown customers, and provided no services to Voice Stream directly. On the other hand, "the constructive ordering doctrine . . . is not so much about *ordering* but about ensuring equal payment of the tariff rate when one receives services pursuant to a filed tariff." Advamtel, 118 F. Supp. 2d at 686. Therefore, it could be argued that it interconnected sufficiently to "receive services" and equal payment of the tariff rate is due. In any case, the Court believes that it would be imprudent to delve into Communications Act law on this issue absent proper briefing when Voice Stream's liability is plainly established under Communications Act § 201.

systematic basis, as well as the generation of fake "spoofed" numbers and accounts held by Voice Stream. The company's failure to pay, otherwise respond to or appear in this action to account for the over $11 million invoiced to them is further evidence of the scienter with which Voice Stream acted. Therefore, the first requirement that Voice Stream act knowingly and with intent to defraud is met.

The statute defines "computer" as "an electronic . . . or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(1). "Protected computer" is defined, as relevant here, as one that "is used in or affecting interstate or foreign commerce or communication . . . ." 18 U.S.C. § 1030(e)(2)(B). The switches used by AT&T and other carriers in the routing of calls are indisputably "data processing devices performing . . . storage functions," and are "used in . . . interstate or foreign . . . communication." As such, the Court finds that Voice Stream accessed a "protected computer" within the definition of the statute.

While "authorization" is not defined in the statute, "exceeds authorized access" is defined as "access[ing] a computer with authorization and . . . us[ing] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). In this case, it appears that Voice Stream was necessarily authorized to access the call data in question in order to transfer it to an intermediate carrier, but then altered this data in a fraudulent fashion. Compl. ¶¶ 29–30, 45–46. The authority is divided on the question of whether misusing or altering information that a defendant was authorized to access is sufficient to state a claim under the CFAA. Four Courts of Appeals have adopted a "broad view" that an individual initially authorized to access data who later misuses or alters it beyond the scope of his

authorization is liable under the statute. United States v. John, 597 F.3d 263, 271–72 (5th Cir. 2010) (employee "exceed[ed] authorized access" when he used employer information, to which he had access for other purposes, to perpetrate a fraud); United States v. Rodriguez, 628 F.3d 1258, 1263–64 (11th Cir. 2010) (employee "exceed[ed] his authorized access" when he accessed information for a non-business reason in violation of employer policy); Int'l. Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006) (employee's authorization to use employer's laptop ended once he violated duty of loyalty to employer, and thus employee accessed computer "without authorization"); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 581 (1st Cir. 2001) (disloyal employee "exceed [ed] authorized access" when he breached employer confidentiality agreement). The Fourth and Ninth Circuit Courts of Appeals, however, have adopted a narrower interpretation of liability. WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199, 203–07 (4th Cir. 2012) (rejecting agency-based theory and holding that employee who downloaded an employer's confidential information, emailed it to his personal account, and provided that information to employer's competitor was not liable under CFAA); United States v. Nosal, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) (holding that "the CFAA does not extend to violations of . . . use restrictions").

The Court of Appeals for the Second Circuit has not ruled on the issue, and courts in this district are divided as to the proper interpretation of the CFAA. See LivePerson, Inc. v. 24/7 Customer, Inc., 83 F. Supp. 3d 501, 512 (S.D.N.Y. 2015) (collecting cases and noting that the majority of courts have adopted the "narrow" approach); JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 522–23 (S.D.N.Y. 2013) (collecting cases and finding "the narrow approach to be considerably more persuasive"). Courts adopting the broad approach have typically made reference to agency theory in their analysis: once a person breached their duty of loyalty or

otherwise acted in such a matter to terminate the agency relationship, he or she lost whatever authority they had to access the protected computer, because that authority was inextricably linked to that agency (or, in this case, contractual) relationship. See, e.g., Citrin, 440 F.3d at 420–21. Courts adopting the narrow approach have emphasized that there is "no statutory language that supports interpreting the CFAA to reach misuse or misappropriation of information that is lawfully accessed" and raised concerns about extensive analysis of an individual's "subjective intent in accessing a computer system," instead of the objective question of whether or not they had access to the system. United States v. Aleynikov, 737 F. Supp. 2d 173, 193–94 (S.D.N.Y. 2010); see also Pakter, 931 F. Supp. 2d at 524 (noting that broad reading of "exceeds authorized access" clause "has breathtaking implications" and would "potentially subject to federal criminal law quotidian abuses by employees").

The Court is persuaded by the narrow approach that has garnered the approval of the majority of the courts of this district because it most closely tracks the language of the statute, provides a readily applicable rule, and is consistent with the admonition that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, 401 U.S. 808, 812 (1971). Accordingly, I recommend that the Court find that AT&T has not stated a violation of the Computer Fraud and Abuse Act because it has not pled adequate facts to support a contention that Voice Stream was unauthorized to access the "protected computers" in question. Instead, it appears from the complaint that Voice Stream was authorized to access and transport the data via arrangements with intermediate carriers Inteliquent and Onvoy Voice Services. Compl. ¶¶ 28–29, 45–46. Though this data may have been subsequently unlawfully altered by Voice Stream in pursuit of a fraudulent scheme, AT&T has not alleged that

Voice Stream's initial entry into the routers was unauthorized. Accordingly, Voice Stream is not liable to AT&T under the CFAA.

### D.      Common Law Fraud

AT&T has also alleged that Voice Stream committed common law fraud under New York, Iowa, and Florida laws. Fraud claims in all three states require (1) a misrepresentation; (2) knowledge of the representation's falsity; (3) intent to deceive; (4) justifiable reliance; and (5) injury. See, e.g., Childers v. New York & Presbyterian Hosp., 36 F. Supp. 3d 292, 309 (S.D.N.Y. 2014); State Farm Mut. Auto. Ins. Co. v. Weiss, 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006); Gibson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 400 (Iowa 2001).

AT&T's complaint adequately pleads all of the elements necessary to prove common law fraud. AT&T alleges that Voice Stream inserted AT&T's CIC number into the data stream of hundreds of thousands of phone calls. This amounted to a misrepresentation to AT&T and other carriers regarding the true origin of the calls. AT&T has also demonstrated that such an insertion must have been intentional and could not be ascribed to negligence or even recklessness because it required systematic and calculated manipulation of signaling data and callers' phone numbers. AT&T has further proven that Voice Stream intended to deceive AT&T into picking up, transporting, and paying the charges associated with the calls. AT&T justifiably relied on the information presented it by Voice Stream; it would normally transport calls with a CIC associated with AT&T in the ordinary course of business. Finally, AT&T was injured as a result because it was not compensated for the services it provided for the altered calls.

Therefore, I recommend that the Court find that Voice Stream is liable to AT&T under the common law of fraud of Iowa, Florida, and New York.

### E.     Florida Deceptive and Unfair Trade Practices Act ("FDUPTA")

AT&T also alleges that Voice Stream is liable under the Florida Deceptive and Unfair

Trade Practices Act ("FDUPTA"), which requires (1) a deceptive act or unfair practice; (2)

causation; and (3) actual damages. <u>Martorella v. Deutsche Bank Nat. Trust Co.</u>, 931 F. Supp. 2d

1218, 1223 (S.D. Fla. 2013). Under the FDUTPA, an unfair practice is one that "offends

established public policy" and one that is "immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers." <u>Samuels v. King Motor Co. of Fort Lauderdale</u>, 782 So.2d

489, 499 (Fla. Dist. Ct. App. 2001).

While Voice Stream's conduct could certainly be characterized as deceptive or unfair and

there is no question that causation and damages are present in this case, the FDUPTA is a

consumer protection statute that does not extend to torts between two sophisticated business

actors. <u>See</u> <u>In re Maxxim Med. Grp., Inc.</u>, 434 B.R. 660, 692–93 (Bankr. M.D. Fla. 2010)

("Although the FDUTPA may extend to protect business entities from unfair and deceptive trade

practices, the FDUTPA has no application to entities complaining of tortious conduct which is

not the result of a consumer transaction."); <u>Golden Needles Knitting & Glove Co. v. Dynamic</u>

<u>Mktg. Enterprises, Inc.</u>, 766 F. Supp. 421, 430 (W.D.N.C. 1991) ("As a matter of law . . . the

statute is limited to 'consumer transactions,' and not to sophisticated commercial transactions . . .

. The statute is not intended to protect parties such as Defendant that have substantial previous

experience in such transactions."). AT&T's complaint alleges that it was defrauded and suffered

damages in several ways by Voice Stream's machinations, but primarily by being deceived into

paying switched access and termination charges that should have been Voice Stream's

responsibility. In short, AT&T alleges that it was duped into providing services by Voice Stream.

This does not, however, state a claim under FDUPTA, which only protects purchasers of

services. See Guyana Tel. & Tel. Co. v. Melbourne Int'l Commc'ns, Ltd., 329 F.3d 1241, 1246–47 (11th Cir. 2003) (holding that providers of services, as opposed to consumers, are not protected by FDUPTA); N.G.L. Travel Associates v. Celebrity Cruises, Inc., 764 So. 2d 672, 674 (Fla. Dist. Ct. App. 2000) (same). AT&T does not allege that it was purchasing consumer services from Voice Stream at any point. Therefore, I recommend that the Court find that AT&T has not stated a claim under FDUPTA.

F.     New York General Business Law § 349

i.     Applicability of the Statute

AT&T also alleges that Voice Stream is liable under New York's General Business Law § 349, which states that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). To state a claim under this section, a plaintiff must show that (1) the act, practice, or advertisement was consumer-oriented; (2) the act, practice, or advertisement was misleading in a material respect; and (3) the plaintiff suffered injury as a result. Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 941 (2012).

The Court has already concluded that Voice Stream's conduct was fraudulent and that AT&T suffered injury as a result. Therefore, the determination of whether Voice Stream is liable under § 349 hinges on whether its misleading practices were "consumer-oriented" within the meaning of the statute.

Under the statute, consumers are defined as "those who purchase goods and services for personal, family, or household use." Sheth v. N.Y. Life Ins. Co., 709 N.Y.S.2d 74, 75 (1st Dep't 2000). Though the "statute's consumer orientation does not preclude its application to disputes between businesses per se . . . it does severely limit it." Cruz v. NYNEX Info. Res., 703

N.Y.S.2d 103, 107 (1st Dep't 2000). At one extreme, "[p]rivate contract disputes, unique to the parties . . . would not fall within the ambit of the statute." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24 (1995). The statute, rather, requires at minimum a deceptive act or practice that has "a broader impact on consumers at large" in that they are "directed at consumers" or "potentially affect similarly situated consumers." Id. at 25, 27. "Derivative actions are barred" under the statute. Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 3 N.Y.3d 200, 207 (2004). Therefore, a company seeking to litigate under the statute must prove that its injuries are "a direct result of the alleged deceptive practices directed at consumers" and not "solely as a result of injuries sustained by another party." M.V.B. Collision, Inc. v. Allstate Ins. Co., 728 F. Supp. 2d 205, 218 (E.D.N.Y. 2010) (citation omitted).

AT&T is plainly not the archetypal plaintiff envisioned by § 349. See Clayton v. Katz, No. 10-CV-5755 (ALC), 2012 WL 4378035, at *5 (S.D.N.Y. Sept. 25, 2015) ("New York courts may consider the sophistication of the parties and amount of the transaction at issue—in other words, whether the parties 'need the protection' of the consumer-protection law"); Teller v. Bill Hayes, Ltd., 620 N.Y.S.2d 769, 774 (2d Dep't 1995) (describing typical case that "involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods[,] usually by way of false and misleading advertising"). The remedies provided under the statute allow parties to recover the greater of actual damages or $50, and the treble damages available under the statute for willful violations are capped at $1,000. New York Business Law § 349(h). Courts have often dismissed § 349 claims brought by similarly large and sophisticated corporate actors. See, e.g., Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc., 328 F. Supp. 2d 443, 450 (S.D.N.Y. 2004) ("Exxon was not the type of consumer § 349 was intended to protect.").

AT&T, however, argues that the approximately 1,692 individual and business customers who were double-billed as a result of Voice Stream's first round of fraudulent activity are such consumers, and because its injury stemmed directly from Voice Stream's conduct directed at these consumers, it should be entitled to sue under the statute. Though Voice Stream's conduct was not directly targeted at consumers, but rather at other telecommunications carriers, it ultimately—and foreseeably—affected consumers by duping AT&T into improperly billing them. Though it is a close question given AT&T's status as a large, sophisticated corporation, given that AT&T's damages are a direct product of Voice Stream's consumer-directed conduct, I find that AT&T does have standing to bring a § 349 suit under the somewhat unique circumstances presented here.

### ii.    Territorial Application

New York Business Law § 349 also requires that the transaction complained of must have occurred within New York. See Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 122 (2d Cir. 2013) ("[T]he appropriate test . . . is to focus on the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction . . . ."); Goshen v. Mut. Life. Ins. Co. of N.Y., 98 N.Y.2d 314, 324 (2002) (concluding that "hatching a scheme" or originating a marketing campaign in New York is not sufficient to be actionable unless the transaction occurred in New York). This is so because the statute reaches only "the conduct of any business, trade, or commerce or in the furnishing of any service *in this state*." New York General Business Law § 349(a) (emphasis added). "The phrase 'deceptive acts or practices' under the statute is not the mere invention of a scheme . . . but the actual misrepresentation or omission to a consumer." Goshen, 98 N.Y. 2d at 325. "To apply the statute to out-of-state transactions . . . would lead to an unwarranted expansive reading of the statute, contrary to

legislative intent, and potentially leading to the nationwide, if not global application of General Business Law § 349." Id.

Out-of-state plaintiffs are not, however, categorically barred from bringing claims under § 349—the emphasis is not on plaintiffs' residency but on the situs of the transaction. In Cruz, the Court of Appeals found that this requirement was met where (1) the defendant was allegedly paid in New York, (2) the defendant allegedly required that all customer communications be directed to a New York location, and (3) its agreement with the consumers contained choice-of-law and forum-selection clauses selecting New York law and New York courts for litigation arising out of the agreement. Cruz, 720 F.3d at 123–24; see also Cline v. TouchTunes Music Corp., No. 14-CV-4744 (LAK), 2016 WL 5478432, at *2 (S.D.N.Y. Sept. 29, 2016) (finding territoriality requirement met for music app customers who transacted with New York based company by internet, but not for cash users of company jukeboxes outside the state); Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 167–68 (S.D.N.Y. 2014) (finding territoriality requirement met when a defendant's website and bank account were in New York, and consumers conducted monetary transactions through the website).

In this case, the Court finds that the connections to New York State are too attenuated, and applying it to Voice Stream's fraud would lead to the "unwarranted expansive reading" of the statute that the New York Court of Appeals warned against in Goshen. First, AT&T does not adequately allege that any of the customers who fell victim to double-billing were residents of New York. See Compl. ¶¶ 37–41 (referencing complaints from Minnesota and Iowa public utilities boards and providing non-New York phone numbers that were called); Panagia Decl. ¶¶ 19–29 (referring to Voice Stream strategy targeting high-cost rural areas in the Midwest and complaints from Minnesota, Iowa, and South Dakota public utilities boards). Though the

consumers' residency is not dispositive, ultimately the transactions in question that caused injury to consumers occurred in their states of residence, not New York. Second, even if it were assumed that Voice Stream's manipulation of the call data, and not AT&T's delivery of the calls to end consumers were the relevant "transaction" necessary to invoke the consumer protection statute, AT&T has not demonstrated that Voice Stream's manipulation of the call data occurred in New York. AT&T has only alleged that Voice Stream's principal place of business is in New York and that it is registered with the New York Public Service Commission. Compl. ¶¶ 3–4. Voice Stream was also registered in Iowa and Florida, and the manipulation could have occurred in either of those states, or, for that matter, a third state. This is an insufficient showing to demonstrate that the conduct in question is subject to New York Business Law § 349.[2] Accordingly, I recommend that the Court find that AT&T has not stated a claim under New York Business Law § 349.

## III.   Damages

"Although a court accepts as true all well pleaded allegations against a defaulting defendant for purposes of determining liability, a default is not an admission of damages, which must be established in a separate evidentiary proceeding." Finkel v. Romanowicz, 577 F.3d 79, 88 n.6 (2d Cir. 2009). "[A] district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012); see also Fed. R. Civ. P. 55(b)(2).

---

[2] To the extent that AT&T relies on New York Business Law § 349 as a basis for injunctive relief and were able to demonstrate the requisite territorial connection to New York, the Court would only order injunctive relief covering transactions in the state.

AT&T has submitted evidence that Voice Stream's fraudulent data manipulation caused it losses totaling $11,915,865.40, plus prejudgment interest.

### A.      The First Fraud in December 2014 to January 2015

AT&T estimates its damages from Voice Stream's first fraud based on the quantification of network usage for which it was not able to recover billings from customers, instead having to provide billing credits to customers who were erroneously billed for this usage.

After discovering Voice Stream's fraudulent activity, AT&T worked with intermediate carrier Inteliquent to determine how the usage altered by Voice Stream had been processed through AT&T's billing systems. In general, long-distance network usage records go to AT&T's Message Investigation Unit ("MIU"), where they are sent to different billing software engines depending on whether the customer is an individual or a business. Parsons Decl. ¶ 10. Billing software engines send usage that they cannot bill back to the MIU, which maintains a registry of unbilled usage. Id.

Some of the altered call usage never made it to the MIU in the first place for unknown reasons, some of the usage was sent to the MIU, but later returned by the billing software engines and ultimately stored as unbilled usage at the MIU, and some of the usage was billed to customers. Id. ¶ 11. AT&T is unable to quantify how much usage never made it to the MIU and was never billed. Id. ¶ 12. The unbilled usage stored in the MIU totaled $960.71 for consumers and $264.10 for businesses, for a total of $1,224.81. Id. ¶ 13; Wyman Decl. ¶ 8 & Ex. A. AT&T also had to issue $4,558.97 in credits to approximately 241 individual customers and $9,335.00 in credits to approximately 1,451 business customers. Parsons Decl. ¶ 14 & Exs. A–C. Accordingly, AT&T has proven to the satisfaction of the Court that the total amount of damages it sustained as a result of Voice Stream's alterations between December 2014 and January 2015

was $15,148.78, totaling the unbilled usage retained in the MIU and the credits that AT&T was compelled to issue its individual and business customers.

**B.      The Second Fraud in May and June 2015**

After discovering the second fraud due to the marked increase in "billing name and address requests" received from non-customers, AT&T's billing department created a "line record," or a list of each of the telephone numbers used to make calls and the total number of minutes associated with each telephone number. Wyman Decl. ¶ 15. This line record revealed three categories of calls: (1) calls associated with Iowa, Florida, and New York telephone numbers allocated to Voice Stream; (2) calls with "spoofed" or falsified telephone numbers; and (3) calls where the true calling party number was not altered. Id. ¶ 16.

For the calls associated with Voice Stream numbers, AT&T set up three billing accounts—one for calls from Iowa numbers, one for calls from New York numbers, and one for calls from Florida numbers. Id. ¶ 17. For the falsified numbers and true calling party numbers, AT&T created a manual summary invoice to bill Voice Stream, as opposed to the falsified numbers or the true calling parties, which would have resulted in double billing. Id. ¶ 17. All of the numbers were billed at AT&T's standard retail customer rate because Voice Stream did not have an account or other business relationship with AT&T. Id. ¶ 20. The rates corresponded to AT&T Tariff FCC No. 4, Business Telecommunications Services. Id. Ex. B.

In total, AT&T Corp. billed Voice Stream for 800,966 minutes of use pursuant its alteration activities in May and June 2015. Panagia Decl. ¶ 54. On July 2, 2015, AT&T billed Voice Stream a total of $6,038,857.17 for the 328,844 minutes of use associated with Voice Stream numbers, demanding payment by July 31, 2015. Wyman Decl. Ex. C. On July 15, 2015, AT&T billed Voice Stream a total of $5,861,859.45 for the 472,122 minutes of use for the

altered traffic not associated with Voice Stream numbers, demanding payment by August 14, 2015. Id. Ex. D.

Accordingly, AT&T has proven to the satisfaction of the Court that the total amount of damages it sustained as a result of Voice Stream's alterations between May and June 2015 was $11,900,716.62.

### C.    Prejudgment Interest

In addition to the economic damages sought from Voice Stream, AT&T further requests an award of prejudgment interest on the amounts billed to Voice Stream in July 2015 and the damages its suffered in January 2015. "Under the filed rate doctrine, a carrier is entitled to receive the full tariff rate." Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp., 931 F.2d 5, 7 (2d Cir. 1991) (per curiam). The decision whether to award prejudgment interest rests entirely within the trial court's discretion. See Loeffler v. Frank, 486 U.S. 549, 557–58 (1988); see also Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 833 (2d Cir. 1992) (stating relevant factors for consideration as "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved and/or (iv) such other principles as are deemed relevant by the court"). Permitting AT&T to recover only the principal amount of its tariffed charges without awarding prejudgment interest would be to diminish the tariff charges "by an amount representing the value of the use of the money owed for the period prior to judgment." Delta Traffic Serv., 931 F.2d at 7 (citation omitted). Therefore, considering the need to fully compensate AT&T, Voice Stream's fraudulent conduct and default in this case, and the remedial purpose of the Communications Act and the filed rate doctrine, the Court finds that an award of prejudgment interest is appropriate.

AT&T first requests prejudgment interest at 18 percent per annum, the late payment charge specified in its tariff filed with the FCC. This is clearly impermissible. The standard for AT&T's late payment charge bears no necessary relationship to the appropriate interest rate—indeed, assessing such a rate of interest would run afoul of New York's usury laws. N.Y. Banking Law § 14-a(1) (setting a maximum interest rate of 16% for all loans); MCI Worldcom, Inc. v. Tele Tower, Inc., No. 01-CV-0255 (LAK), 2002 WL 378424, at *2 (S.D.N.Y. Mar. 11, 2002) (applying this limitation to Communications Act claim).

Alternatively, AT&T seeks a rate of nine percent per annum, which is the New York statutory interest rate. N.Y. C.P.L.R. § 5004. AT&T argues that its New York fraud claims support the application of the rate provided for in N.Y. C.P.L.R. § 5001(a), which states that such interest "shall be recovered upon a sum awarded because of . . . an act or omission depriving or otherwise interfering with . . . possession or enjoyment of [] property . . . ." But it is not clear from the record where exactly the fraudulent conduct occurred, nor what proportion of it occurred in New York, even though Voice Stream's principal place of business and billing address is in the state. Indeed, the Court has found that Voice Stream's conduct was not sufficiently linked to New York to justify the application of New York Business Law § 349. Moreover, while the Court recommends that Voice Stream be found liable for common law fraud under the laws of Iowa, Florida, and New York, it views the case as primarily a federal Communications Act claim. In order to promote uniformity in damage awards issued under the Act, the Court therefore looks to prejudgment interest awards made in similar cases.

As has been the case for many other federal statutes, courts have often looked to the federal treasury bill rate referenced in 28 U.S.C. § 1761 in determining a prejudgment interest

award. [3] See, e.g., Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., No. 92-CV-1735 (LAP),

1999 WL 258263, at *5 (S.D.N.Y. Apr. 29, 1999) (applying treasury bill rate and noting that

"because it provides the plaintiff with an amount that could have been obtained on a relatively

safe investment, thus accomplishing the goal of making plaintiff whole"); ITT World Commc'ns,

Inc. v. W. Union Tel. Co., 598 F. Supp. 1435, 1438 (S.D.N.Y. 1984) (awarding prejudgment

interest at similar "rate applicable to short-term risk-free obligations"). The Court finds that this

rate is appropriate for this case as well.

AT&T is entitled to prejudgment interest dating back to the date of injury. See McCrann

v. U.S. Lines, Inc., 803 F.2d 771, 773–74 (2d Cir. 1986) ("Since the plaintiff was entitled to the

interest income on the damage award from the date of injury to the payment of judgment, courts

award prejudgment interest to address the disparity."). In this case, AT&T suffered two injuries,

one for $15,148.78 in January 2015 and one for $11,900,716.62 in July 2015. As the July injury

is over 780 times greater than the January injury, the Court recommends that prejudgment

interest be calculated from August 14, 2015, the date of the payment demand on the last unpaid

invoice issued by AT&T. The interest should be compounded annually. See Nat'l Commc'ns

Ass'n, 1999 WL 258263, at *6.

## IV.   Equitable Relief

In addition to requesting money damages, AT&T requests that the Court enter injunctive

relief against Voice Stream to address the threat of Voice Stream continuing to manipulate call

---

[3] The statute, which addresses post-judgment interest, refers to a "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961.

data. AT&T argues that without such an injunction, Voice Stream will continue fraudulent activity, thus requiring repetitive and costly litigation.

A court may issue an injunction on a motion for default judgment if the moving party demonstrates that it is entitled to injunctive relief under the applicable statute. N. Face Apparel Corp. v. Moler, 2015 WL 4385626, at *8 (S.D.N.Y. July 16, 2015). AT&T notes that the CFAA, FDUPTA, and New York General Business Law § 349 all authorize injunctive relief; however, the Court has concluded that AT&T has not made a case for liability under any of these statutes. The Court has, however, determined that Voice Stream violated § 201 of the Communications Act. AT&T cites to a case arising out of a tariff-based claim relating to the Act in which permanent injunctive relief was awarded. Pacific Bell Tel. Co. v. 88 Connection Corp., No. 13-CV-1157 (KSC), 2014 WL 4063148, at *2–3 (S.D. Cal. Aug. 14, 2014). This case, however, is inconsistent with precedent from our Court of Appeals.

Congress restricts a court's equitable power to issue injunctive relief when a statute limits that power "in so many words, or by a necessary and inescapable inference." Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946). The Court of Appeals for the Second Circuit has held that the Communications Act "creates such an inference with respect to private parties seeking injunctive relief for violations of the Act." Conboy v. AT & T Corp., 241 F.3d 242, 255 (2d Cir. 2001). The Act is explicit in creating a private right of action and establishing carrier liability, mentioning damages only. 47 U.S.C. §§ 206–207. The Act also provides for private injunctive relief for violations of specific, enumerated provisions. See, e.g., 47 U.S.C. § 406 (providing for private injunctive relief where a party is prevented from "receiving service in interstate or foreign communication by wire or radio"); 47 U.S.C. § 274 (e)(2) (providing for private injunctive relief where a Bell operating company violates the electronic publishing restrictions of

§ 274). Section 201 of the Communications Act, which Voice Stream violated, is not among the enumerated sections. Finally, the Act also allows district courts to enjoin violations upon application by the Federal Communications Commission or the Attorney General. 47 U.S.C. § 401(b). "The existence of these remedial provisions, in combination with the absence of any provision mentioning a general right to seek private injunctive relief for violations of the Act, clearly indicates that Congress did not intend to permit private parties to seek such relief." Conboy, 241 F.3d at 255. [4]

Therefore, the Court recommends that AT&T's claim for permanent injunctive relief be DENIED.[5]

## CONCLUSION

For the foregoing reasons, the Court recommends that Voice Stream be found liable to AT&T for violating Section 201 of the Communications Act and state common-law fraud under New York, Florida, and Iowa law. The Court recommends that Voice Stream not be found liable for a tariff collection claim under the Communications Act or violations of the Computer Fraud and Abuse Act, New York Business Law § 349, and the Florida Deceptive and Unfair Trade Practices Act.

---

[4] The specific provision violated in Conboy was 47 U.S.C. § 222, concerning consumer privacy and confidentiality. However, the section granting a private right of action to enforce this provision, 47 U.S.C. § 207, applies equally to 47 U.S.C. 201, the section at issue in this case.

[5] Because AT&T has failed to demonstrate that there is a statute entitling it to injunctive relief, the Court need not consider the four-factor test requiring AT&T to demonstrate (1) likelihood of success on the merits; (2) likelihood of suffering irreparable injury that cannot be remedied with monetary damages; (3) the balance of hardships tips in favor of AT&T; and (4) the public interest would not be disserved by the issuance of an injunction. Salinger v. Colting, 607 F.3d 68, 77 (2d Cir. 2010). Because AT&T has not briefed its entitlement to an injunction under New York, Florida, or Iowa common law, nor whether such an injunction would be preempted by the remedies provisions in the Communications Act, the Court does not consider these claims.

The Court finds that AT&T has demonstrated damages in the sum of $11,915,865.40 plus prejudgment interest calculated from August 14, 2015, to entry of judgment. The Court recommends that AT&T's request for permanent injunctive relief be denied.

SARAH NETBURN
United States Magistrate Judge

DATED:       New York, New York
             February 2, 2017

             *              *              *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Louis L. Stanton at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Stanton. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).